UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:98-CR-37-20-F
No. 5:00-CV-61-F

| | | |
|---|---|---|
| EARL WEBB, | ) | |
|     Petitioner, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
|     Respondent. | ) | |

This § 2255 action is before the court on the Government's Motion for Summary Judgment [DE #565]. The Government's prior dispositive motions have been denied. The court makes reference to prior orders entered herein for a complete record of earlier proceedings.

In a prior order, the court summarized Webb's claims as follows:

> The court perceives that Webb's claims may be consolidated into a single Ineffective Assistance of Counsel claim because he assigns all blame on his lawyer[s]. Therefore, the instant motion is one for Ineffective Assistance of Counsel resulting in (a) an involuntary guilty plea; (b) a greater sentence than appropriate; and (c) dismissal of his appeal.

Order of March 18, 2005 (DE # 558) at 1-2.

Title 28, United States Code, Section 2255 provides for an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255. A federal court in a habeas proceeding must hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle him to relief. *Townsend v. Sain*, 372 U.S. 293, 312 (1963). Ineffective assistance of counsel claims generally, but not always, rely on evidence outside the record. *See, e.g., United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991). Thus, when a colorable Sixth Amendment claim is presented, and where material facts are in dispute involving inconsistencies beyond the record, a hearing is

necessary. *See Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir. 1990); *Moore v. U.S.*, 950 F.2d 656, 661 (10th Cir. 1991).

### FACTUAL & PROCEDURAL BACKGROUND

Webb pled guilty, pursuant to a Memorandum of Plea Agreement [DE #223] with the Government, to conspiracy to distribute and possess with intent to distribute cocaine base (crack), cocaine, heroin, and marijuana; and using and carrying a firearm during and in relation to a drug trafficking crime. Six other charges were dismissed in exchange for his guilty plea. During his Rule 11 hearing, Webb specifically was advised that the offenses to which he was entering a guilty plea exposed him to a life sentence on Count One, plus five years on Count Two; these provisions also are contained in the Memorandum of Plea Agreement bearing Webb's signature. *See* DE #223. He was advised that he could not withdraw his guilty plea even if he were to receive the maximum sentence. Under oath, Webb stated to the court that he understood and agreed to these provisions.

Prior to sentencing, Webb's court-appointed counsel announced that he had discovered a conflict of interest in his representation of Webb, and was permitted to withdraw. Substitute counsel was appointed and the sentencing hearing was continued in order for substitute counsel to familiarize himself with the case. Objections were made to certain aspects of the Presentence Report, but none affected Webb's Guideline Range.

At the beginning of Webb's sentencing hearing, the undersigned posed the usual questions to the Assistant United States Attorney:

> Q. Mr. Bennett, has the government made any representation to the defendant or his counsel as to assistance to the Government?
>
> A. We have, Your Honor.
>
> Q. All right, sir. Has he given you any assistance?
>
> A. It is not ripe for any type of motion at this time.

2

> Q. Has the Government made any representation to the defendant or his counsel that future cooperation may result in a Rule 35(b) motion?
>
> A. We have, Your Honor.
>
> . . . .
>
> Q. Mr. Webb, do you understand that the Government is not required to return to court with a Rule 35(b) motion to seek a reduction in your sentence, and that it is completely within the Government's discretion whether or not to do so? Do you understand that?

A. Yes, Sir.

Transcript of Sentencing Hearing at 2-3.

The undersigned adopted the factual findings of the Presentence Report, which resulted in an offense level of 40, criminal history category of III, and a custody range of 360 months to life imprisonment on Count One, and 60 months consecutive on Count Two. Defense counsel explained that Webb was cooperating with the Government and was attempting to continue to do so. Webb exercised his right to allocution and stated, "Yes, I am sorry. I apologize to the court, I just got caught up in the wrong crowd. That is all I got to say." *Id.* at 6.

The court's findings, as set forth in Webb's Presentence Report, including the information provided in a statement by a named witness that the witness was "present in approximately October 1996 when . . . Webb and [a co-defendant] killed [a named victim] during a robbery in . . . Fayetteville." Sealed PSR at ¶ 7. The court sentenced Webb to a term of 420 months on Count One, and a mandatory consecutive 60-months sentence on Count 38. The court stated as its reason for imposing that sentence, "The Court imposed a sentence in the middle of the range to achieve incremental punishment for the murder, drug trafficking and the assaultive and violent nature of defendant's conduct which occurred during the course of the instant offense." Webb's Judgment and Commitment [DE #355] at 7. Webb was advised of his right to appeal but was reminded that he had waived some or all of that right as part of his plea agreement with the Government.

Appointed counsel filed a Notice of Appeal on Webb's behalf, but later withdrew it, supposedly with Webb's consent and at his direction. Webb attempted again to file an appeal, but his efforts were untimely. He filed the instant action pursuant to 28 U.S.C. § 2255 on January 31, 2000 [DE #486]. A flurry of motions and orders followed, resulting finally in the Government's Motion for Summary Judgment [DE #565].

## INVOLUNTARY PLEA

Webb complains that his original court-appointed attorney, Mr. Peregoy, threatened that if Webb did not sign the Memorandum of Plea Agreement offered by the Government, he would be prosecuted for murder and sentenced to death. Webb states that he would not have entered into the plea agreement, but for his belief in the truth of his lawyer's "threat." The Government counters this claim by reference to Webb's sworn answers to the court's questions during the Rule 11 litany, and to his statements under oath that he understood the court's advice, the consequences of his guilty plea, and the possible sentence.

Specifically, the Government points out Webb acknowledged that he had waived his right to appeal or seek collateral review of his conviction or sentence except on grounds of ineffective assistance of counsel or prosecutorial misconduct not known to him at the time of the entry of this guilty plea. The Government queries, "If, indeed, Webb had been coerced into entering a plea, that fact would have certainly been know by the time his plea was signed at the Rule 11 hearing." Government's Memorandum [DE #566], at 3-4. While that fact alone might preclude this claim, there are other, even more compelling ones.

In support of his Response in Opposition to the Motion to Dismiss [DE #569], Webb has filed his Affidavit [DE #570] in which he details under oath the factual basis for his claim. He avers, *inter alia*,

> 5. Mr. Peregoy instructed me to sign and initial each page, as I did not have a choice in the matter. He advised that if I did not sign the plea agreement, I would be prosecuted for Capital Murder.

> 6. The reason that I signed anything and agreed to a guilty plea was that I feared that I would get the death penalty for a murder charge even though I was not involved in any killing in any way. The only reason that I believed I could receive the death penalty was because my lawyer told me that, and I believed it, *especially since I received paperwork from Janet Reno that I would be prosecuted for Capital Murder which he did not explain to me.*

Affidavit of Earl Webb [DE #570] ¶¶ 5-6 (emphasis added).

Although all the details are not of record, the comments of the Assistant United States Attorney at sentencing, the content of some of Mr. Peregoy's correspondence to Webb during the course of his representation,[1] a comment in the Presentence Report, and the court's reference in the Statement of Reasons portion of Webb's sentence, all reveal that allegations that Webb had in some way been involved in the murder of the named victim, played some part, to some degree, in the manner in which the instant case was prosecuted. Even though the very first paragraph of Webb's Memorandum of Plea Agreement states that "[t]his Memorandum constitutes the full and complete record of the plea agreement [and] [t]here are no other terms of this agreement in addition to or different from the terms herein," there is nothing in the law that forbids the Government from taking into account information that it finds to be reliable in deciding how to charge a defendant and to conduct subsequent plea negotiations, if any. Similarly, the sentencing court may consider all credible relevant evidence in crafting an appropriate sentence. *See, e.g., United States v. Samuels*, 51 Fed. Appx. 430, 431 (4th Cir. 2002) ("Sentencing courts are accorded wide discretion in evidentiary matters and may consider any relevant, reliable evidence.") (citation omitted).

Furthermore, Webb states in his Affidavit that he "received paperwork from Janet Reno that I would be prosecuted for Capital Murder." That being the case, and in light of other evidence that purportedly implicated him in the named victim's murder, it is difficult to follow

---

[1] Webb has appended several of Mr. Peregoy's letters to Webb's Response to Motion for Summary Judgment.

5

Case 5:98-cr-00037-F   Document 578   Filed 02/09/06   Page 5 of 18

Webb's rationale for suggesting that his lawyer was responsible for the "threat" of a separate homicide prosecution and death sentence if Webb did not accept the Government's offer to dismiss six other counts against Webb if he would plead guilty to a single drug count and single gun count in this case. It very well may have been that the State of North Carolina and/or federal government had agreed to forego homicide charges in lieu of the sentence Webb was expected to receive as a result of this federal drug and gun prosecution.[2]

Even assuming that was the case, however, it does not support the suggestion Webb raises in this action -- that his lawyer used *untrue* threats to intimidate him into executing a plea agreement that he did not understand or enter into knowingly and voluntarily. *See North Carolina v. Alford*, 400 U.S. 25, 31 (1970).

> We held in *Brady v. United States*, 397 U.S. 742 (1970), that a plea of guilty which would not have been entered except for the defendant's desire to avoid a possible death penalty and to limit the maximum penalty to life imprisonment or a term of years was not for that reason compelled within the meaning of the Fifth Amendment. . . . The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. . . . That [the defendant] would not have pleaded except for the opportunity to limit the possible penalty does not necessarily demonstrate that the plea of guilty was not the product of a free and rational choice, especially where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage.

*North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (citations omitted). Furthermore, had there been a collateral agreement with the Government concerning Webb's alleged involvement in the

---

[2] Of course, the notion of dual sovereignty recognizes that the federal government is not bound by the actions of state authorities and that successive state and federal prosecutions are constitutionally permissible. *See United States v. Woolfolk*, 399 F.3d 590, 595 (4th Cir. 2005) (internal citations omitted).

homicide, it was his responsibility to speak up at his arraignment or sentencing hearing; instead, he stated under oath that there was no such agreement.[3]

Assuming the truth of Webb's theory that Mr. Peregoy negotiated with the United States Attorney and a state District Attorney, and came up with " 'some sort of package prosecution' " in which the State charges would be " 'worked out,' " *see* Response to Motion for Summary Judgment [DE #569] at 2 (source of quotes not revealed), the result was that Webb was permitted to plead guilty to two of eight federal charges against him, have the remainder dismissed, and walk away from state and/or federal capital murder charges.[4] Theoretically and, again, accepting Webb's theory as true, had Mr. Peregoy *not* negotiated the plea agreement with the Government, Webb would be facing not only multiple mandatory consecutive life sentences had he gone to trial and been convicted of the federal drug and gun charges, but quite possibly also the death penalty had he been charged and convicted in state and/or federal court for murder. It is difficult to believe that Webb would prefer this result.

Webb also complains that both Mr. Peregoy and the Assistant United States Attorney led him to believe that by entering a guilty plea and cooperating with the Government, his sentence likely would be lower. "Based on his belief, Webb believed that his plea was in his best interest and that objections [to the Presentence Report] which he had were rendered moot because he would obtain a lesser sentence in any event." Webb's Response [DE #569] at 14. Webb also contends that the Government promised that it would seek a reduction in his sentence by way of a Rule 35(b) motion. However, the prosecutor's statements (quoted *supra* at 2-3) fall just short of promises, and, again, Webb stated under oath that there were no other agreements between

---

[3] Moreover, it is difficult to imagine how Webb could have been prejudiced by such an agreement if one did exist.

[4] Both the State of North Carolina and the United States, in certain circumstances, provide for imposition of the death penalty upon conviction of murder.

the parties not memorialized in the plea agreement. *Cf. United States v. White*, 366 F.3d 291, 295 (4th Cir. 2004) ("It is well-established 'that when a plea rests in any significant degree on a promise . . . of the prosecutor, so that it can be said to be part of the inducement or consideration[,] such promise must be fulfilled.' ") (quoting *Santobello v. New York*, 404 U.S. 257, 262 (1971)). Furthermore, the *general* proposition that entering a guilty plea and cooperating with the Government is likely to result in a lower sentence, more often than not, is true. It does not, however, amount to a promise.

Boiled down to its essence, Webb's complaint is that he believed that entering into the plea agreement his lawyer had negotiated on his behalf was in his best interest. Having acted on that belief and receiving a sentence that, although well within the statutory and Guideline range, Webb believes is excessive, Webb now seeks relief from his guilty plea and sentence by assigning fault to his court-appointed attorney. He acknowledges, however, that where a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the defendant's plea depends on whether his counsel's advice "was within the range of competence demanded of attorneys in criminal cases." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985). Webb has alleged nothing concerning his appointed counsel's conduct related to the voluntariness of the plea that fell below the applicable range of competence. Indeed, if counsel were able, on his client's behalf, to head off a capital prosecution and did *not* do so, *then* a question might arise whether such failure fell within the range of competence. Furthermore, it appears that Mr. Peregoy's concerns about a potential murder charge were not fabricated out of whole cloth. The record – including the Assistant United States Attorney's comments at sentencing – provides factual support, not of Webb's guilt or innocence of murder, but certainly of the viability of a homicide prosecution.

Informed and experienced assistance in weighing the risks of conviction against the possibility of acquittal is a critical function that trial counsel provide to criminal defendants. Defendants, like Webb, themselves ultimately must choose, upon considering the advice of counsel, which option they believe is in their best interest. The record in this case reflects that Webb was relatively well-informed about the risks and benefits of his options; he reflects that he made the decision he felt was most beneficial to him. Neither he nor his lawyer had any control, ultimately, over whether the Government would file a Rule 35(b) motion. That decision lies exclusively with the Government, and Webb stated under oath at the inception of his sentencing hearing that he understood it.

In summary, Webb has alleged no facts giving rise to an ineffective assistance of trial counsel claim on grounds of involuntariness of plea. His allegations, taken as true, are not actionable; they simply describe the plea bargaining process under the (now advisory) Sentencing Guidelines. Webb's first claim– that his counsel's ineffective assistance rendered his guilty plea involuntary – is meritless.

## CONFLICT OF INTEREST

Webb alleges that Mr. Peregoy was aware of, but failed to disclose, an actual conflict of interest until after Webb had entered his guilty plea. Webb revealed in his pleadings in this matter, however, that Peregoy stated in an October 23, 1998, letter to him that Peregoy was not aware of the conflict until he received Webb's Presentence Report, which listed the names of defendants in related cases. In the same letter, Peregoy stated, *inter alia,* "[T]his is an obvious conflict of interest for me to continue to representing your interests. I cannot represent Mr. McIntyre either." Exhibit 5 to Webb's Response [DE #569]. Peregoy's former client, McIntyre, who purportedly provided information against Webb at some point, was not a co-defendant

named in the same indictment as Webb. In fact, McIntyre's case was before a different district court judge.

The Supreme Court has explained the underlying premise of the Sixth Amendment right to the effective assistance of counsel at trial:

> The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of Counsel for his defence." This right has been accorded, we have said, "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658 (1984). It follows from this that assistance which is ineffective in preserving fairness does not meet the constitutional mandate, *see Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); and it also follows that defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation. As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

*Mickens v. Taylor*, 535 U.S. 162, 166 (2002).

At a minimum, the Sixth Amendment right to effective assistance of counsel encompasses the attorney's duty of loyalty to the client and, concomitantly, the duty to avoid conflicts of interest. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Tatum*, 943 F.2d at 375. A defendant asserting a conflict of interest claim must establish that an actual conflict of interest existed and that it adversely affected counsel's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). The defendant need not demonstrate prejudice if the conflict of interest actually affected the adequacy of the legal representation. *Id.* at 349. Thus, if a defendant shows that a conflict of interest existed and that it adversely affected counsel's performance, prejudice will be presumed and the defendant need not demonstrate a reasonable probability that, but for the attorney's conflict of interest, the trial's outcome would have been different. *Id.* at 349-50. This presumption of prejudice arises because " 'it is difficult to measure the precise effect on the defense' " when representation is " 'corrupted by conflicting

interests.'" *Rubin v. Gee,* 292 F.3d 396, 401-02 (2002), quoting *Strickland,* 466 U.S. at 692. When lawyers' conflicts of interest adversely affect their performance, it calls into question the reliability of the proceeding and represents a breakdown in the adversarial process fundamental to our system of justice.

The simple possibility of a conflict does not support a claim of a Sixth Amendment violation. *See United States v. Mers,* 701 F.2d 1321, 1328 (11th Cir.), *cert. denied,* 464 U.S. 991 (1983); *Thomas v. Foltz,* 818 F.2d 476, 481 (6th Cir.), *cert. denied,* 484 U.S. 870 (1987). Furthermore, an adverse effect cannot be presumed solely from the existence of a conflict of interest. *See Mickens,* 535 U.S. at 170-75 (2002); *Rubin,* 292 F.3d at 401; *United States v. Sheppard,* 121 Fed. Appx. 508, 511 (4th Cir. 2005).

### Peregoy's Representation of McIntyre

According to the record in McIntyre's case, No. 7:97-CR-61-BO (E.D.N.C.), Mr. Peregoy filed his Notice of Appearance on July 7, 1997, and signed McIntyre's plea agreement which was filed on September 23, 1997. McIntyre was sentenced on July 16, 1998, and Mr. Peregoy is listed as counsel of record on McIntyre's Judgment and Commitment Order. At sentencing, McIntyre was the recipient of a U.S.S.G. § 5K1.1 Motion for Downward Departure in recognition of the "substantial assistance" he provided to the Government, but the record does not disclose the nature of that assistance.[5] McIntyre received a further reduction in his sentence pursuant to the Government's Rule 35(b) motion, filed July 14, 1999. The Rule 35(b) hearing was continued on the Government's motion filed September 14, 1999; the Certificate of Service showed service by mail on Mr. Peregoy. The Rule 35(b) motion came on for hearing on January 19, 2000, and the Deputy Clerk's rough notes show Mr. Peregoy as counsel for McIntyre. Again, however, the

---

[5] Although a transcript of Mr. McIntyre's sentencing hearing may reveal more detail, the court concludes, *infra,* that McIntyre's cooperation with the Government did not affect Webb's sentence.

record as it currently exists does not reveal the nature of Mr. McIntyre's assistance to the Government, but a transcript of the Rule 35(b) motion probably would.

Notwithstanding his statement in the October 1998, letter that he no longer could represent either Webb or McIntyre, Mr. Peregoy never filed a motion to withdraw from representation of McIntyre. Indeed, it appears that Mr. Peregoy continued to represent McIntyre at least until January 2000, and that he was representing Mr. McIntyre during the time that McIntyre provided whatever assistance he provided to the Government earn both a 5K1.1 motion for downward departure *and* a subsequent Rule 35(b) motion for reduction in his sentence.

### Peregoy's Representation of Webb

Mr. Peregoy entered his notice of appearance on behalf of Webb on March 20, 1998, between the dates of McIntyre's plea and his sentencing. Consistent with the intention stated in his letter of October 23, 1998, Peregoy moved to withdraw from Webb's case on that same date; his request was allowed by order of October 29, 1998. Therefore, it appears on the face of the record that there was an overlap in Peregoy's representation of McIntyre and Webb during the *entire* time he appeared as attorney of record for Webb – between March 20, 1998, and October 29, 1998. He continued to represent Mr. McIntyre for more than a year thereafter, including during McIntyre's sentencing (which included a § 5K1.1 motion), and a subsequent Rule 35(b) proceeding. Webb's Presentence Report indicates that McIntyre attributed 56.7 grams of cocaine base to Webb, and that he told investigators that Webb had been armed during drug transactions in which they engaged. There is no indication when or in what context McIntyre shared this information with the Government, or whether his counsel was present when he did so.

Notwithstanding all of the foregoing, however, the record on its face reveals that Peregoy's apparently concurrent representation of McIntyre and Webb could not have had *any*

12

adverse effect on Webb's sentence. Webb's Guideline Sentence on Count One (the drug conspiracy count) was determined, not by drug quantity, but by cross-reference to U.S.S.G. § 2A1.1 – First Degree Murder – as required by U.S.S.G. § 2D1.1(d)(1), which provides, "If a victim was killed under circumstances that would constitute murder . . . apply § 2A1.1 (First Degree Murder)." By adopting the findings of the Presentence Report, the court found as a fact that the killing of the named victim had occurred under circumstances that would constitute murder. Accordingly, Webb's base offense level for Count One was determined to be 43 solely by cross-reference to U.S.S.G. § 2A1.1, in which drugs play no part. A base offense level of 43 minus three points for acceptance of responsibility, together with a criminal history level of III, resulted in a Guideline Range of 360 months to life on Count One.[6]

That Guideline Range, as well as Webb's 420-month sentence for Count One were within the statutory maximum sentence of life imprisonment that would have been applicable had Webb's sentence been driven by drug quantity under U.S.S.G. § 2D1.1. Moreover, although the facts as found by the court include a drug quantity of 1,034.775 grams of cocaine base (crack) and 28.35 grams of marijuana, even if the 56.7 grams of crack attributed to Webb by McIntyre were stricken, the remaining 978.075-gram quantity of cocaine base is well over the 50 grams required for a Guideline Range of 360 months to life imprisonment.

The foregoing analysis demonstrates that, even if Webb's attorney had a technical conflict of interest prior to withdrawing from representation, the peculiar facts of *this case* are such that any conflict did not affect the "adequacy" of legal representation, because Webb's sentence was not driven by any factor associated with the nature of the alleged conflict – that Peregoy simultaneously represented Webb and McIntyre, who at some point, provided evidence

---

[6] The 60-month mandatory consecutive sentence on Count 38 (§ 924(c) conviction) also is unaffected by any alleged conflict of interest concerning Peregoy's representation of McIntyre. According to the Presentence Report, it was not McIntyre who provided the information that formed the factual basis for Count 38. *See* Presentence Report ¶ 8.

against Webb concerning drug quantity and possession of firearms. *See Cuyler*, 446 U.S. at 350. As shown, even if McIntyre's attribution of 56.7 grams of cocaine base to Webb were stricken, the remaining drug quantity was almost 20 times the amount needed to place Webb in the 360 to life Guideline Range. Finally, the record herein reveals that it was not McIntyre who provided information to the Government that Webb was armed during the March 1997 incident underlying Webb's conviction for a violation of 18 U.S.C. § 924(c) charged in Count 38. *See* Sealed PSR, ¶ 11.

For the foregoing reasons, Webb has demonstrated no genuine issue of material fact necessitating an evidentiary hearing on his conflict of interest claim.

## EXCESSIVE SENTENCE

Webb's next general ground for relief is his contention that his lawyers rendered ineffective assistance of counsel that resulted in his receiving an excessive sentence. He contends that his second court-appointed lawyer, Mr. Peterson, had inadequate time to prepare for the sentencing hearing, and that his decision not to challenge drug quantity was ill-advised.

Webb contends that had Mr. Peterson had more time to prepare, he could have advanced objections to the Presentence Report based on (i) "minimal role," (ii) special family circumstances; and (iii) substantial assistance grounds. The record is plain, however, and Webb seems to acknowledge, that the defense tactic at sentencing was to avoid confrontation with the Government and to continue cooperating in hopes of receiving a Rule 35(b) motion for downward departure. Webb stated under oath at sentencing that he understood there were no promises or guarantees he would receive a Rule 35(b) motion for a reduction in his sentence, but even the Government seemed to anticipate that such a motion might be forthcoming. Although, ultimately, no Rule 35(b) motion was filed on Webb's behalf, that fact could not have been foreseen at the time Webb and his counsel were considering the proffered plea agreement or planning their response to the Presentence Report.

14

The posture of cooperation tactic employed by both of Webb's district court counsel is a common one that often is successful. Defense attorneys are acutely aware of the utter folly of pursuing *both* cooperation with the Government *and* a full-blown attack on the Presentence Report and recommended Guideline Range. It is universally understood that the Government is highly unlikely to dispatch an agent to "debrief" a defendant who has engaged the Government in a contest over material facts affecting the sentence, or who has appealed a sentence that has been imposed. Competent defense counsel would not advise his client to bite the hand that he hopes will pen a Rule 35(b) motion.

It is well established that courts generally refuse to engage in second-guessing a trial counsel's strategic or tactical decisions. *See, e.g., Lowery v. Anderson*, 225 F.3d 833, 843 (7th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence.").

Finally, Webb, who was sentenced in 1998, complains that the *Apprendi-Blakely-Booker* line of cases would have afforded him some relief had his lawyer objected to the drug weight or wording of the indictment. Not until *Booker* was decided in 2005 was it held that the *Apprendi* ruling, announced in 2000, applied to federal criminal cases, and *Booker* is not retroactively applicable on collateral review. *See United States v. Morris*, 429 F.3d 65, 72 (4th Cir. 2005). Furthermore, "an attorney's assistance is not rendered ineffective because he failed to anticipate a new rule of law." *Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir.), *cert. denied*, 517 U.S. 1171 (1995); *United States v. McNamara*, 74 F.3d 514, 516 (4th Cir. 1996) ("failure to anticipate a new rule of law [is] not constitutionally deficient") (citation omitted); *cf. United States v. Haynesworth*, 34 Fed. Appx. 133, 134 (4th Cir. 2002) ("[W]e conclude that in the time-frame at issue here, counsel was not ineffective in failing to raise an *Apprendi* claim in the context of a federal drug offense.")

15

In summary, Webb is entitled to no relief on his "excessive sentence" claim.

## DISMISSAL OF APPEAL

The record in this case contains a copy of Webb's December 9, 1998, Notice of Appeal[7] that bears the following handwritten statement across the bottom: "12/31/98 I, Earl Edward Webb, withdraw my notice of appeal in this matter." A signature purporting to be that of the defendant Webb follows. In the instant motion, Webb complains that he did not knowingly assent to the dismissal of his appeal, and suggests that his lawyer acted without his permission and contrary to his instructions. Webb contends that

> he did not knowingly and intelligently waive appeal rights. Indeed he maintains that he did not understand the document that he signed to contain the sentence 'penciled in' above his signature to the effect that he assented to dismissal, and that as soon as he learned of its dismissal, he prepared a *pro se* notice of appeal.

Webb's Response [DE #569] at 21 n.11.

There are at least three straightforward reasons why Webb cannot prevail on his claim that his appellate lawyer was ineffective for permitting Webb's direct appeal to be dismissed. First, Webb waived his right to take a direct appeal of his conviction or sentence except upon grounds of ineffective assistance of counsel or prosecutorial misconduct not known to him at the time of his guilty plea. *See* Memorandum of Plea Agreement ¶ 2(c). The Fourth Circuit Court of Appeals regularly dismisses appeals that were waived as part of a valid plea agreement. *See, e.g., United States v. Blick*, 408 F.3d 162, 170 (2005). Whether he agreed to the dismissal or not, the appeal would have been dismissed because Webb had waived his right to bring it.

Second, the Fourth Circuit Court of Appeals repeatedly has "held that 'a claim of ineffective assistance should be raised in a 28 U.S.C. § 2255 motion in the district court rather

---

[7] The official docket in this matter shows that the Notice of Appeal was filed on December 19, 1998, but the date of the file stamp and execution of the document is December 9, 1998.

than on appeal, unless the record conclusively shows ineffective assistance.'" *United States v. Bartram*, 407 F.3d 307, 311, n.2 (4th Cir. 2005) (quoting *United States v. King*, 119 F.3d 290, 295 (4th Cir. 1997) (internal citation omitted), petition for *cert.* filed, No. 05-8263 (U.S. Dec. 13, 2005). Had Webb attempted to raise the claim on appeal that Mr. Peregoy rendered ineffective assistance, the appellate court would have dismissed it.

Finally, as noted above, to prosecute an appeal while attempting to curry favor with the Government in hopes of winning a Rule 35(b) motion is contrary to common sense. Again, the defense tactic in this case was to seek a reduction in sentence by cooperating with the Government in lieu of engaging it in battle over the Guideline Range. This observation is not speculative; this strategic decision is factually reflected in the record. That the tactic ultimately was unsuccessful is no ground for attacking defense counsel's efforts; the Rule 35(b) decision is solely within the discretion of the Government.

Webb is entitled to no relief on his claim that his lawyer was ineffective for dismissing his appeal in the Fourth Circuit Court of Appeals.

## CONCLUSION

For the reasons set forth above, the court has determined that there has been neither a colorable Sixth Amendment claim presented, nor a showing of any material fact in dispute involving inconsistencies beyond the record. Consequently, a hearing is unnecessary. *See Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir. 1990). Accordingly, as Webb has failed to carry his burden to defend against the Government's Motion for Summary Judgment, the court concludes that there is no genuine issue of material fact necessitating an evidentiary hearing in this case, and that the Government is entitled to judgment as a matter of law. The court has reviewed the entirety of Webb's § 2255 motion and memoranda filed in support thereof, and has found no meritorious claim. Accordingly, the Government's Motion for Summary

Judgment [DE #565] is ALLOWED, and this action hereby is DISMISSED with prejudice. Any pending motions are DENIED as moot.

SO ORDERED.

This the 9th day of February, 2006.

_____
JAMES C. FOX
Senior U.S. District Judge